**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**NORTHERN DIVISION**

| | |
|---|---|
| **PRISON LEGAL NEWS,** | |
| Plaintiff, | **MEMORANDUM DECISION** |
| vs. | **AND ORDER** |
| **CAPT. KIM CHESHIRE, et al.,** | **Case No. 1:04CV173DAK** |
| Defendants. | |

This matter is before the court on Defendants' Motion for Summary Judgment and Plaintiff Prison Legal News' two motions for Partial Summary Judgment. In connection with those motions for summary judgment, Plaintiff has filed four motions to strike and Defendants have filed one motion to strike. The court heard oral arguments on these motions on May 16, 2006. At the hearing, Plaintiff was represented by Brian Barnard, and Defendants were represented by Frank Mylar. Having considered the memoranda, exhibits, and affidavits submitted by the parties, and the law and facts relevant to the pending motions, the court renders the following Memorandum Decision and Order.

**BACKGROUND**

Plaintiff, Prison Legal News, publishes and distributes a nationwide, monthly magazine known as Prison Legal News ("PLN") that contains news articles regarding litigation trends, recent court rulings, and other matters of interest to inmates and corrections officials. Plaintiff brings this action under 42 U.S.C. § 1983 seeking equitable relief from enforcement of Defendants' policies that prevent PLN from distributing its periodical to individual inmates.

PLN is mailed to prisoners through the United States Postal Service. The Cache County

Jail ("the Jail") has enacted rules and regulations governing inmates' receipt of and access to publications.  Inmates at the Jail are not allowed to subscribe to magazines or newspapers on an individual basis and cannot receive magazines or newspapers through the United States mail. The parties dispute whether inmates were allowed to have individual subscriptions prior to 2005.

In November of 2004, PLN mailed a copy of its magazine along with subscription information to three inmates at the Jail.  The parties dispute whether the inmates were subscribers or potential subscribers.  PLN's officers testified in their depositions that they were not aware of any subscribers at the Jail, but they did not have the database of subscription information before them.  Inmate Edwin Beitz's Affidavit states that while he was incarcerated at the Jail, he wanted to personally subscribe to magazines and newspapers but he was told that individual subscriptions were not allowed.  Beitz's Affidavit, however, does not state that he requested, attempted to obtain, or had a subscription to PLN.  Inmates Jerad Anderson's and Jeff Perez's Affidavits, however, both state that they wanted subscriptions to PLN and that each of them were "informed that a paid subscription to Prison Legal News was entered in my name while I was incarcerated at the Cache County Jail."  Inmate Stan King's Affidavit also states, "I have been informed that a paid subscriptions to Prison Legal News was entered in my name while I was incarcerated at the Cache County Jail."  Inmate William Horton's Affidavit states that he had personal subscriptions to various magazines before being transferred to the Jail, but he was not allowed to keep those subscriptions.  Horton's Affidavit, however, does not state that he had a subscription to PLN that was discontinued.  Plaintiff filed with the court an Errata Sheet and Signature Page Re: Deposition of Don Miniken that included a subscription list for the Jail. But there is no explanation of what that subscription list describes or when it was created.  There is no documentary evidence that demonstrates whether there were any paid subscribers to PLN at

the Jail.

The copies of the October 2004 edition of PLN that PLN mailed to the inmates were returned to PLN with a stamp on the front stating "RETURN TO SENDER UNAUTHORIZED MATERIAL" and hand-written words stating "CONTENT NOT ALLOWED" or a check in the box stating that the pictures were too large.  PLN was not given notice of a right to appeal at that time.  Inmate Jerad Anderson was given a "Notice of Denied or Held Mail" stating that he did not receive a copy of PLN because the contents were inadmissable into the facility.

PLN mailed two more issues of its magazine to inmates John Kinter and Stan King.  These copies of the magazine were also rejected by the Jail staff.  The copy sent to John Kinter was placed in his jail property locker.  The copy sent to King was returned to PLN.  King filed an inmate grievance complaining that he could not subscribe to PLN.

On January 10, 2005, the Jail sent a letter to PLN stating that issues of the magazine may have been rejected at the jail because the Jail does not permit inmates to receive personal magazine subscriptions.  The letter stated that "[t]his letter serves as official notice that you have the opportunity to object to the rejection of your publication at the Jail.  To avail yourself of this right, you may appeal this decision in writing by directing your signed and dated appeal to the Jail Commander . . . within ten business days of the date of this letter."

Inmates at the Jail are notified when they enter the facility that they are not entitled to subscribe to periodicals.  The Jail has a law library that contains periodicals, and inmates can check out periodicals from the library.  A rule limits an inmate to five periodicals in his cell at one time.  The Jail allows inmates to request certain subscriptions to be purchased by the Jail if they are not contrary to legitimate penological interests.  The Jail also tries to monitor demand levels of the periodicals available in the law library.  Presently, there are 32 different magazines

received each month for approximately 300 inmates.  The number of subscriptions of each of these magazines was not provided by either party.  Additions to the subscription list may only occur quarterly.  PLN asserts that only once has a magazine been added to the subscription list at the request of an inmate.

Prior to this lawsuit, Jail officials and administration were not aware of any inmate demand for PLN.  None of the inmates claim that they submitted a request for the publication or spoke to any of the Jail staff about obtaining a subscription to PLN.  However, the Jail now has two subscriptions to PLN available in the law library.  PLN is not considered one of the 32 general interest magazines available to the inmate population because the Jail has classified it as a part of the Jail's law library.  In 2005, only 3 inmates checked out issues of PLN.  Despite the limited interest, the Jail represented at the hearing on this motion that the library intends to keep the publication in the library because of its coverage of important legal issues.

The materials in the library are the property of the Jail.  When items are received by individual inmates they are the property of the inmate and can create property rights issues.

Some larger jails in Utah and the Utah State Prison allow inmates to have personal subscriptions to periodicals.  Those facilities have enacted rules to deal with any related problems.  The Jail contrasts itself to these facilities based on the size of the jails and the other facilities typically house longer-term inmates.  The Jail asserts that one of several reasons for not allowing inmate subscriptions is the short stay of its average prisoner.  The average stay of an inmate at the Jail is 30.7 days.  Whereas, the average amount of time for PLN to process a subscription and send a copy of the magazine to a subscriber is four to six weeks.  PLN, however, asserts that there are some long-term inmates housed at the Jail and its interest is only with respect to these long-term inmates.

## II.  DISCUSSION

This case involves Plaintiff's First Amendment and due process rights with respect to sending its magazine by mail to Cache County Jail inmates and the Jail's refusal of those magazines based on its policy prohibiting inmates to have individual subscriptions.  Plaintiff's first motion for partial summary judgment deals with the due process issue and its second motion for summary judgment addresses the First Amendment issue.   Defendants have also moved for summary judgment addressing both the First Amendment and due process claims.  In connection with these motions, the parties have also filed several motions to strike certain evidence.

### MOTIONS FOR SUMMARY JUDGMENT

Because the parties' motions for summary judgment address the same issues, the court will analyze the motions together.  Initially, Defendants assert that Plaintiff does not have standing to raise its claims.  Plaintiff, in contrast, argues that it has been directly harmed by the Jail's rule because it has been prevented from communicating with subscribers, or potential subscribers, at the Jail.

Standing is a threshold jurisdictional issue.  *Keyes v. School Dist. No. 1*, 119 F.3d 1437, 1445 (10th Cir. 1997).  To establish standing, a plaintiff "must demonstrate a personal stake in the outcome." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).  "A party has standing when (1) [it] has suffered an injury in fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision." *Skrxypczak v. Kauger*, 92 F.3d 1050, 1052 (10th Cir. 1996).

"Particularly important, for present purposes, is the requirement of an 'injury in fact,' which the Supreme Court has defined as 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'"

*Initiative and Referendum Institute v. Walker*, - - - F.3d - - -, 2006 WL 1377028, at *3 (10th Cir. May 17, 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks, citations, and footnote omitted)).   "For purposes of the standing inquiry, the question is not whether the alleged injury rises to the level of a constitutional violation.  That is the issue on the merits.  For standing purposes, [the court] ask[s] only if there was an injury in fact, caused by the challenged action and redressable in court."  *Id.*

Moreover, a Section 1983 claim must be based upon violations of the Plaintiff's personal constitutional rights and not the rights of someone else.  *United States Dep't of Labor v. Triplett*, 110 S. Ct. 1428, 1431 (1990).   Therefore, Plaintiff cannot allege the constitutional harm of any of the inmates at the Jail to confer standing on its claims.

The Tenth Circuit's decision in *Jacklovich v. Simmons*, 392 F.3d 420 (10th Cir. 2004), acknowledges that "[i]nmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison."  *Id.* at 426.  The court reasoned that "resolution of the inmates' claims requires balancing between the constitutional rights retained by inmates and those who send them publications against the deference owed to prison authorities when it comes to prison administration."  *Id.*  Therefore, the court implicitly recognized that there are certain First Amendment rights to information that do survive incarceration and those rights also apply to those who send inmates publications.  *See also Thomas v. Leslie*, 176 F.3d 489 (10th Cir. 1999) (unpublished decision) (finding total ban on newspapers in a Kansas county jail unconstitutional).

Defendants distinguish *Jacklovich* because the publisher in that case was sending its publication to paid subscribers and, in this case, Plaintiff has failed to prove it had any actual

paid subscribers at the Jail.  Plaintiff states that whether there were paid subscribers at the Jail is irrelevant because whether the magazines that were rejected were samples or subscriptions, the magazines were rejected because inmates cannot have personal subscriptions and its right to communicate with inmates by sending them PLN was violated.

*Jacklovich* clearly recognized a publisher's right to communicate with subscriber inmates.  Plaintiff's Complaint alleges that its right to such communication has been infringed by the Jail's policy precluding individual subscriptions and a ruling from this court declaring the policy unconstitutional would redress the claim by allowing it to have direct subscriptions with inmates.  Defendants' arguments with respect to standing significantly overlap with their arguments on the merits.  The strength of the rights Plaintiff holds with respect to its communications with the inmates – whether it was sending materials to paid subscribers or soliciting potential subscribers – goes to the merits of Plaintiff's claims, not standing.  The alleged injury does not need to rise to the level of a constitutional violation for purposes of standing.  *See Initiative and Referendum Institute*, 2006 WL 1377028, at *3.

Defendants also assert that Plaintiff has not been financially injured.  The amount of money Plaintiff receives from inmate subscriptions versus Jail subscriptions may go to possible damages but appears to be irrelevant in the discussion of demonstrating an injury in fact for purposes of standing.  And, if the issue really was about the cost differentials of subscriptions, Plaintiff's harm would be easily redressed in the form of damages.  The issue is the alleged injury to Plaintiff's constitutional rights.  Plaintiff does not need to prove its entire case in order to establish standing for the court to hear its claim. The court concludes Plaintiff's claims that its constitutional rights have been harmed by the Jail's policy precluding individual inmate subscriptions could be redressed by this court if this court were to declare the Jail's policy

unconstitutional.  Therefore, the court finds that Plaintiff has standing to pursue its claims.

**I.  *First Amendment Rights***

With respect to the merits of Plaintiff's claims, the *Jacklovich* court explained that "[i]n weighing the First Amendment interests against the deference afforded corrections officials, the reasonableness of the regulations and policies matter."  *Id.*   "Although the Court has continually recognized (1) the difficulty of running a prison, (2) the separation of powers concerns when a federal court assumes a function (prison administration) entrusted to the legislative and executive branches, and (3) the need for federal courts to accord deference to state prison authorities, those factors do not mean that every prison regulation is insulated from review no matter what the facts may be."  *Id.* (citation omitted).

The United States Supreme Court has stated that "there is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners."  *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (applying *Turner* reasonableness standard on regulations concerning incoming publications).  The United States Supreme Court has determined that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  The *Turner* Court set forth a four-part test for courts to consider in determining the constitutionality of such policies: "(1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest; (2) whether alternative means of exercising the constitutional right remain available to inmates; (3) any effect accommodating the right would have on guards and inmates; and (4) the absence of ready alternatives."  *Jacklovich*, 392 F.3d at 426 (citing *Turner*, 482 U.S. at 89-90).  As in *Jacklovich*, the court finds it appropriate to analyze this case

using the four-part *Turner* test.  Plaintiff bears the burden of establishing each prong of the test.

*1.  Are governmental objectives underlying the regulations at issue legitimate and neutral, and "rationally related" to that objective?*

There appears to be no dispute that the policy is neutral because it applies to all personal subscriptions and all inmates equally.  Therefore, the issue is whether the objectives underlying the ban on individual subscriptions is rationally related to that objective.  Defendants contend that its subscription policy furthers the penological interests of safety, security, and management of the Jail.  The Jail must review all incoming mail for a variety of security reasons.  Allowing publications from various sources would require more intense scrutiny of each publication and require the review of potentially hundreds or thousands of publications each month.  Moreover, many of these inmates would be released or transferred soon after receiving their publications but the Jail would continue to receive the publication.

The Jail must further limit the amount of material in an inmate's cell due to fire hazards, flooding of toilets and sinks, hiding of contraband, making of weapons, etc.  If inmates subscribe to weekly magazines, it would require multiple inspections of the magazines and the inmate's cell.  In addition, inmates sometimes barter or fight over certain publications.  Allowing the library to make the magazines equally available to all inmates destroys any ascribed value to a publication.  It further allows the Jail to quickly identify what materials an inmate has checked out and to identify if an inmate has a magazine in his cell for which he did not check out (stealing from another or improper inmate to inmate communication).

The policy also helps conserve limited Jail resources in terms of monetary costs and correctional officer time.  After the subscription is started, the Jail must handle the magazine as inmate property.  Before it does so, the mail room must carefully review and inspect the

magazine to ensure it does not contain contraband.  There could also be issues with property interests.

Plaintiff argues that no rational relationship exists between the objective of not creating a burden on the Jail staff and Defendants' restrictions on First Amendment rights.  Plaintiff claims that Defendants must demonstrate actual documented problems, rather then merely hypotheticals, to justify their ban on individual subscriptions.

However, corrections "officials are to remain the primary arbiters of the problems that arise in prison management."  *Shaw v. Murphy*, 532 U.S. 223, 230 (2001).  This court must "accord substantial deference to the professional judgment of [corrections] administrators" in reviewing regulations.  *Overton v. Bezzetta*, 539 U.S. at 132.  Officials need not demonstrate an "actual danger in order to support the reasonableness of their determinations.  It is enough to show that a potential danger exists."  *Espinoza v. Wilson*, 814 F.2d 1093, 1097-98 (6th Cir. 1987).

The court finds that the critical fact in analyzing this case is the short stay of inmates at the Jail.  Jail inmates stay an average of 30.7 days.  This time is not sufficient to even begin a subscription to PLN.  It takes 4-6 weeks to begin subscriptions to PLN.  Due to the transitory nature of inmates in jails, as opposed to prison inmates, PLN has subscribers in less than one percent of the 3,600 jails in this country according to the editor of PLN.

Although the average state and federal inmates stay in the Jail slightly longer on average, Defendants cannot predict how long either state, federal, or local inmates will remain in the jail. All inmates are subject to being moved by stated and federal authorities with short notice.  In fact, none of the inmates who provided affidavits in this case are still at the Jail.  The use of the library copies would actually enable many inmates to see a copy of PLN before they leave the jail, whereas if they had to get a personal subscription, they would be gone before they received

their first issue.  Accordingly, the court concludes that the Jail policy of requiring access to periodicals only through the Jail library is reasonably related to the Jail's legitimate penological interests.

> *2. Do jail inmates have alternative means of exercising that right?*

Plaintiff argues that access to a jail library is not an adequate substitute for individual subscriptions.  Plaintiff complains that there are too few periodicals in the Jail's law library for the number of inmates housed at the Jail.  PLN also claims that inmates should be given their own choice of reading materials, the three day limit to magazines checked out from the library is not sufficient time, and the inmates cannot quickly or effectively have the jail add new titles to the subscription list.

Alternatives "need not be ideal; however, they need only be available.  *Overton*, 539 U.S. at 135.  Jail libraries have been upheld as constitutional alternatives when inmates were denied personal subscriptions.  *Hause v. Vaught*, 993 F.2d 1079 (4th Cir. 1993); *Dawson v. Scurr*, 986 F.2d 257 (8th Cir. 1993); *Johnson v. Hunter*, 192 U.S. App. LEXIS 34743; *Manning v. Abramajtys*, 1992 U.S. App. LEXIS 5059.

In this case, the inmates actually have access to PLN through the library at no cost. Therefore, the publication is available to all inmates equally.  Before this case was brought, there is no evidence that any prisoner requested PLN to be included in the Jail library.  Since PLN was included in the library, few inmates have had an interest in the publication.  During the entire year of 2005, only three inmates checked out copies of PLN.  The Jail monitors the use of library inventory and will adjust the variety and quantity as needed.  Although Plaintiff claims that the changes in the Library occur on a quarterly basis and occur rarely, there is no evidence in this case that an inmate ever even made a request for PLN.  Plaintiff's affidavits stating that popular

magazines are hard to get are irrelevant to the issue of whether PLN's right to communicate with prisoners can be done effectively through means other than individual subscriptions.  The facts of this case demonstrate that the publication is easily accessible.

Although the Tenth Circuit has found a complete ban on PLN to be unconstitutional as applied, the prison in that case did not provide access to periodicals through a library.  In addition, the prison was a large state prison not a small rural jail with a transitory population.  Given the transitory nature of the prison population at the Jail, the library subscriptions are an adequate alternative means that allow inmates access to PLN who might not be there long enough to begin a subscription.  For those who are there long enough to begin a subscription, the low check out rate demonstrates that there is a high availability of the publication.  Plaintiff has stated that its goal is to have its information disseminated to the inmates.  This goal is satisfied by the subscriptions in the Jail library.  Therefore, Plaintiff has not met its burden of demonstrating that the subscriptions in the library are not an adequate alternative means.

*3.  What is the impact that accommodation of the asserted constitutional right will have on others in the prison?*

Plaintiff contends that there will be only a slight impact on prison officials and staff if the Jail allows individual subscriptions.  Plaintiff also claims that the Jail previously allowed subscriptions and they could do it again.  Whereas, Defendants assert that the impact is a significant burden on the administrative staff and that personal subscriptions have not been allowed in recent years.  Despite the dispute regarding whether or not individual subscriptions have been available in recent years, the court finds that the Jail has put forth unrebutted evidence that an administrative burden would be placed on Jail staff as a result of individual subscriptions in relation to the transitory nature of the Jail population.

Although Plaintiff claims that the Jail can regulate inmate subscriptions in the same manner they now deal with inmate's personal property, individual subscriptions to daily, weekly, and monthly publications would significantly increase the amount of review and inspection conducted by the staff for security screening.  In addition, this case involves issues of the magazine that were sent to individual inmates on a solicitation basis.  If PLN routinely solicited new inmates in an attempt to gain readership, the amount of publications coming into the Jail would increase even further, especially given the turnover of the inmate population at the Jail.  The Jail obviously has limited resources to commit to these types of activities.  Therefore, the court concludes Plaintiff has not met its burden in demonstrating that there would not be an impact on the Jail's orderly management of the facility.

*4.  Do obvious, easy alternatives show that the regulation is not reasonable, but is an "exaggerated response" to prison concerns?*

Plaintiff argues that this final prong requires the court to look at the presence or absence of ready alternatives that would fully accommodate its rights at de minimus costs to valid penological interests of the Jail.  Plaintiff contends that the fact that other jails in Utah allow individual subscriptions shows that the Jail's response is exaggerated.  In addition, Plaintiff claims that the alternatives have all been ignored on the sole ground that they would create extra work for Jail staff.

However, the fact that other jails and the Utah State Prison allow individual subscriptions does not automatically demonstrate that the Jail's policy is an exaggerated response.  Each jail has a unique population and has to formulate its own set of policies with respect to its population.  The short stay of inmates is obviously a factor that Jail administrator's must factor into their policies.  The Plaintiff has not demonstrated a readily available alternative that would

13

not impact the Jail.  A publisher's only rule would create the same administrative constraints and be of little value to the transitory population of the Jail.  Therefore, the court concludes that Plaintiff has not met its burden of proving any of the *Turner* factors.  Accordingly, the court finds no violation of Plaintiff's First Amendment rights based on the Jail's policy prohibiting individual publications.

## II.  *Due Process Rights*

The Tenth Circuit has recognized that publishers have a right to procedural due process when publications are rejected.  *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10ᵗʰ Cir. 2004).  The court agreed with the Fourth Circuit "'that publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate-subscribers.'"  *Id.* (quoting *Montcalm Publ'g Co. v. Beck*, 80 F.3d 105, 106 (4ᵗʰ Cir. 1996)).  The court found "that providing adequate individualized notice to the publisher would appear to impose a minimal burden."  *Id.* at 434.

In this case, all but one of the publications were returned to sender with a stamp stating that they were unauthorized material.  Although the other information on the envelope for most of the publications appear to be erroneous–some checked the box that the pictures were too large–it was clear to Plaintiff that the materials were all being rejected.

The parties in this case dispute the applicable regulations that were in effect during the relevant time period.  Regardless of the policies or regulations that were in place, the issue before the court must turn to whether the Jail's "Return to Sender" practice and January 10, 2005 letter to Plaintiff was adequate due process notice.   Plaintiff contends that the January 10, 2005 letter to PLN was too vague and was sent two months after the rejection of the magazines. Defendants assert that PLN cannot show a due process violation based on inadequate notice and

the court must first assess whether Plaintiff has a protected due process interest and whether it was deprived of such interest by the Jail.

Defendants contends that PLN had no subscribers at the Cache County Jail in 2004, and, at most, had only a desire to seek potential subscribers. The evidence before the court supports this contention. The case law regarding a publisher's due process interests all refer to a publishers communications and access to inmate subscribers. In this case, Plaintiff's officers admitted that the October issues that were sent to three Jail inmates were promotional sample packets and not paid for subscriptions. This court refuses to extend the current state of the case law to provide due process protections to publishers soliciting subscriptions. Plaintiff's mere inability to sell personal magazine subscriptions at the Jail does not trigger due process protection. Plaintiff is free to engage in commerce in general. However, the Jail need not allow Plaintiff to enter the Jail or mandate that the Jail change its property rules to allow prisoners to possess individual magazine subscriptions. This fact is crucial because it shows that Plaintiff did not have a protected interest in receiving notice that these prisoners did not receive its publication. In addition, Plaintiff was not deprived of any benefit by state action, because it received its magazine samples back from the Jail.

Furthermore, under the facts of this case, the court concludes that Plaintiff was not denied procedural due process. Plaintiff complains about the quality of the notice it was given when the magazines were rejected. Procedural due process is basically the opportunity to be heard in response to an alleged deprivation. It is unclear what minimal process is required for a publisher whose magazine is returned, but it must be a lower standard for a publisher who has no subscribers and is attempting to gain subscribers. Although the courts have found that notice to a publisher with inmate subscribers is a minimal burden, if every publisher who wished to gain

or solicit inmate subscribers was entitled to notice, the burden could be significant. The court finds that there is no reason to extend the current due process protections available to publishers who have inmate subscribers to publishers seeking to gain subscribers.

Plaintiff argues that the jail had no policy in place, however, the jail used its procedures for contraband received by the mail staff because personal magazines were considered contraband by the Jail at that time. In conformance with this policy, the Jail returned to sender the three copies of PLN with a stamp and written reasons for the return of the editions. Although the reasons stated for the denial were not correctly stated, Plaintiff simply failed to appeal the issue. Plaintiff did not contact the Jail. Rather it filed this lawsuit. The Jail then sent the January 10, 2005 letter to Plaintiff regarding the rejection of the magazines. Arguably the letter was not sent contemporaneously with the rejection of the magazines. However, it provided Plaintiff with an opportunity to appeal the prior rejections. The court concludes that Plaintiff received all the process it was required to receive in this context.

Therefore, the court finds no violation of Plaintiff's First Amendment or due process rights. The court also finds no basis for entering an injunction requiring the Jail to maintain its copies of PLN in the Jail's law library. The Jail has represented that it intends to keep PLN permanently as a part of its law library and it is obviously aware of the potential for future lawsuits if the subscriptions are discontinued. Accordingly, the court grants Defendants' motion for summary judgment on these claims and denies Plaintiff's motions for partial summary judgment on these claims.

### III. Qualified Immunity

Furthermore, the individual defendants claim that they are entitled to qualified immunity. Plaintiff presents a unique case in that it seeks redress under the First and Fourteenth

Amendments to solicit magazine subscriptions to prisoners in a secure Jail environment by

sending what it terms as sample packets consisting of an edition of PLN, a subscription order

form flyer, and a flyer regarding books it has for sale.  Defendants are not aware of any case law

holding that a publisher has a right to deliver its flyers and magazine samples to prisoners who

do not have a paid subscription.  There is no evidence in this case that there was a paid

subscription that was denied.  Therefore, the law was not clearly established at the time the

individual defendants acted and they are entitled to qualified immunity.  In addition, even if

there were paid subscribers, the rejection of the October issues of PLN was done before the

Tenth Circuit's decision in *Jacklovich*.  Therefore, the law was not clearly established in the

Tenth Circuit at that time with respect to a publisher's due process rights to notice.  Therefore,

the individual defendants are entitled to qualified immunity.

## IV.  State Law Claims

Plaintiff's state law claims are barred because Plaintiff failed to comply with a bonding

requirement when suing local law enforcement officers and it failed to file a notice of claim

under the Utah Governmental Immunity Act.  The requirements of these statutes have been

strictly interpreted by Utah courts and any deviation from the requirements mandate dismissal of

the claims against the governmental entity.  Accordingly, the court dismisses Plaintiff's state law

claims.

## MOTIONS TO STRIKE

## 1.  Motion to Strike Expert Report of Gary DeLand

To the extent that this motion deals with testimony at trial, the motion is moot given the

court's decision on summary judgment above.  To the extent that Plaintiff asks this court to

disregard DeLand's testimony in connection with the summary judgment motions because his

Affidavit does not contain all of his opinions, the court finds that Plaintiff has not been prejudiced.  Plaintiff deposed DeLand in December 2205.  Therefore, they have had adequate notice of his opinions.  Any defect in using DeLand's prior Affidavit as an expert report is harmless.  Plaintiff's motion to strike is denied.

## 2.  Motion to Strike Deposition Testimony of Gary DeLand

Plaintiffs seek to strike all of the deposition testimony that goes beyond the affidavit for the reasons given above.  Again, the court finds no prejudice to Plaintiff.  Plaintiff's have had DeLand's deposition testimony since last December.  The motion to strike is denied.

## 3.  Plaintiff's Motion to Strike Affidavit of Holly Dixon

Plaintiff moves to strike the affidavit of Holly Dixon on the grounds that she was not identified as a person with relevant, discoverable information before discovery closed.  Therefore, Plaintiff requests that Defendants not be allowed to use her affidavit which was submitted on February 21, 2006, in support of their motion for summary judgment.

Defendants argue that they answered interrogatories on September 14, 2005, and identified Holly Dixon as a deputy in charge of inmate programs, including library responsibilities, in response to a request for additional persons who may have knowledge of the case.  These interrogatory responses were provided before Plaintiff had taken any depositions in the case.

Because Dixon was timely identified during discovery, the court finds no basis for this motion.  Accordingly, the motion is denied.

## 4.  Plaintiff's Motion to Strike Affidavit of Lt. Brian Locke

Plaintiff moves to strike the affidavit of Brian Locke on the grounds that his affidavit contradicts his deposition testimony.  Plaintiff claims that Locke has been inconsistent with

respect to which policies were in effect at which time.  Defendants argue that Locke's

subsequent affidavit is not contradictory and it was submitted to clarify the confusion that

Plaintiff's counsel appeared to have with respect to the effective dates of the new and old

policies.  Defendants state that there is no one generic answer to the question of which policy

was in effect in December 2004.  The answer depends on which policy was involved and which

specific employee was implementing it.

Because the basis for Plaintiff's motion goes to the weight to give the testimony rather

than its admissibility, the court finds no grounds for the motion to strike.

**5.  Defendants' Motion to Strike Plaintiff's Inadmissible Affidavits**

Defendants argue that the court should strike the first and second affidavits of Plaintiff's

corporate representatives, Don Miniken and Paul Wright.  Defendants also seek to strike the

affidavits of prisoners King, Perez, Anderson, and Horton.  Rule 56(e) of the Federal Rules of

Civil Procedure requires evidence supporting summary judgment to be admissible and based

upon the affiant's personal knowledge.  Rule 56(g) of the Federal Rules of Civil Procedure

requires that opposing affidavits be submitted in good faith.

With respect to Don Miniken's affidavits, Defendants assert that his affidavits are

contradicted by his deposition testimony.  Miniken claims in his affidavits that there are

subscribers to PLN in the Cache County Jail, including Beitz, Perez, and Anderson.  However, in

his deposition, he admitted to having no knowledge whether they had subscribed prior to being

sent the October edition and that his mailing of the October editions to them was consistent with

sending a sample rather than sending a copy to a subscriber.  He admitted in his deposition that

the three named inmates were probably merely trying to subscribe and he didn't know if they

had a subscription.  Also, in his affidavit, he states that Defendants did not give him notice of

any procedure or right to appeal the rejection of PLN materials.  However, in his deposition, he admitted that the Jail sent a letter regarding PLN's right to appeal and that he saw the letter.  In his affidavit, he states that PLN is unable to distribute its publications at the Jail, but in his deposition he admitted to being aware of the copies being provided through the Jail's library subscriptions.

As discussed with respect to Locke's Affidavit above, contradictions between affidavits and deposition testimony go to the weight and credibility of the evidence, not its admissibility.  Therefore, the motion to strike is denied with respect to these portions of Miniken's Affidavit.

However, Paragraphs 9 and 10 of Miniken's first affidavit are by his own admission based only on "information and belief."  This is contrary to Rule 56(e) and cannot be considered on summary judgment.  Therefore, Defendants' motion to strike these paragraphs is granted.  .

With respect to Paul Wright's affidavits, Defendants argue that the affidavit simply parrots almost verbatim Miniken's affidavit and many of the statements are contradicted by Wright's deposition testimony.  Wright's affidavit states that PLN had subscribers at the Jail.  However, in his deposition Wright states that he does not believe that Beitz, Perez, or Anderson were subscribers.  Wright admits that he mailed Beitz an October issue and describes it as a sample mailing.  He also stated that he does not send samples to subscribers.  Wright admitted that he only sent sample packs to the three named inmates.  He also admitted that he has no personal knowledge whether any Cache County inmates became subscribers.

Again, these arguments go to the weight of the evidence, not its admissibility.  Therefore, Defendants' motion to strike is denied as to these portions of Wright's affidavits.  However, paragraphs 9, 10, and 13 of Wright's first Affidavit and Paragraphs 9 and 12 of Wright's second Affidavit are stricken because they are based upon "information and belief" rather than personal

knowledge.

Defendants next move to strike the affidavits of Horton, Anderson, King, and Perez

under Rules 56(e) and (g).  Defendants argue that the affidavits are almost exact copies of each

other, are all signed by convicted felons, and the inmates lack foundation for many of their

statements in that none of these inmates were incarcerated for a significant length of time, none

of them are presently in jail, and there are no supporting statements to show that they have any

knowledge as to the operation of the library.

These types of attacks go to the weight and credibility of the evidence, not the

admissibility f the evidence.  To the extent that there is information in the affidavits that are

irrelevant to the present legal issues, the court has not considered the evidence.  However,

statements in these affidavits based "upon information and belief" rather than based on personal

knowledge are stricken.

Accordingly, Defendants' motion to strike is granted with respect to any portions of

affidavits submitted by Plaintiff that are based upon information and belief rather than personal

knowledge.  Otherwise, Defendants' motion to strike is denied.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motions for partial summary judgment are DENIED

and Defendants' Motion for Summary Judgment is GRANTED.  Plaintiffs' four motions to

strike are DENIED.  Defendants' Motion to Strike is GRANTED IN PART with respect to the

portions of Plaintiff's supporting affidavits that are based upon information and belief AND

DENIED IN PART with respect to the remaining portions of the affidavits challenged by

Defendants.  This case is dismissed with prejudice, each party to bear his and its own fees and costs.

DATED this 30th day of June, 2006.

BY THE COURT:

DALE A. KIMBALL
United States District Judge